**Chris and Susie QUINTANA,
Plaintiffs–Appellants,**

v.

**UNITED BLOOD SERVICES, A DIVISION OF BLOOD SYSTEMS, INC.,
Defendant–Appellee.**

No. 88CA1057.

Colorado Court of Appeals,
Division II.

Jan. 17, 1991.

Rehearing Denied Feb. 14, 1991.

Certiorari Granted June 3, 1991.

Holland & Hart, A. Bruce Jones, Maureen Reidy Witt, Steven C. Choquette, Denver, for plaintiffs-appellants.

Lewis and Roca, Douglas L. Irish, Susan M. Freeman, Steven J. Lahensky, Phoenix, Ariz., Downey & Douglas, P.C., Arthur Downey, Denver, for defendant-appellee.

Waller, Mark & Allen, P.C., Kevin D. Allen, Denver, amicus curiae for Colorado Trial Lawyers Ass'n.

Breit, Best, Richman and Bosch, P.C., Susan Smith Fisher, Denver, amicus curiae for Colorado Defense Lawyers Ass'n.

Arnold & Porter, James J. Sandman, Denver (Arnold & Porter, Bruce M. Chadwich, Karen Keegan, Washington, D.C., of counsel), amicus curiae for American Red Cross, American Ass'n of Blood Banks and Council of Community Blood Centers.

Opinion by Judge SMITH.

The plaintiffs, Chris and Susie Quintana, appeal the judgment entered on a jury verdict finding against the plaintiffs and in favor of the defendant, United Blood Services. We reverse and remand for a new trial.

During surgery on May 27, 1983, plaintiff Susie Quintana received a transfusion of several units of blood and plasma which were supplied by the defendant. She began experiencing a variety of distressing symptoms a few months later, and, in December 1985, she was diagnosed as having Acquired Immune Deficiency Syndrome (AIDS).

The defendant was notified that one of its units of blood may have been the source of the infection. Upon subsequent testing of the various donors whose blood or plasma the plaintiff had received, one of the donors did indeed test positive for the antibody to the AIDS virus.

Plaintiffs brought this action against the defendant alleging that the blood or plasma it had supplied had caused the AIDS infection and that it had been negligent in failing properly to screen blood donors and in failing to implement testing procedures that would have indicated the presence of AIDS in the donated blood that plaintiff had received.

Evidence at trial disclosed the following relevant facts regarding the AIDS epidemic. At the time the infected blood was donated in early May 1983, the causative agent of AIDS was not known, although there was evidence that the disease was blood borne. And, by early 1983 the experts were in agreement that members of high-risk groups for AIDS (homosexual males, intravenous drug users, hemophiliacs, and Haitians) should be excluded from donating blood. However, no consensus had been reached as to the best method for doing so.

In January 1983, the American Association of Blood Banks (AABB), the Council of Community Blood Centers, and the American Red Cross published a "Joint Statement on Acquired Immune Deficiency Syndrome (AIDS) Related to Transfusion." The Joint Statement concluded that the evidence of AIDS transmission through blood was inconclusive but recommended more thorough screening for AIDS symptoms in donors. It did not recommend donor screening on the basis of sexual preference. Nor did it recommend surrogate testing, that is, testing for the presence of factors believed to be associated with AIDS. Surrogate testing is employed when, as in the case of AIDS, there is no specific test available for the primary condition.

In March 1983, the Food and Drug Administration (FDA) issued its first recommendations concerning AIDS and the blood supply. The FDA recommended that whole blood centers, which generally collect their blood from volunteers, give their donors pamphlets describing the groups at high risk for AIDS so that the donors themselves would, if they believed it necessary, defer from donating based on the information in the pamphlet. On the other hand, plasma centers, which generally pay their donors, were advised to take the addi-

tional steps of examining donors for swollen lymph nodes and recent weight loss. The FDA did not recommend surrogate testing for either groups because the efficacy of such tests was uncertain.

The plaintiffs contended at trial that the measures adopted by whole blood centers, including the defendant, were inadequate to reduce the risk of AIDS transmission through transfusions. Their theory was that a reasonably prudent blood bank would have questioned its donors directly regarding their sexual preference and would have implemented surrogate testing. They alleged that the defendant was negligent because it failed to do so.

One of plaintiffs' experts, the director of a plasma center, testified that, in February 1983, his center implemented a screening procedure in which prospective donors were asked if they were members of a group at high risk for contracting AIDS. Members of these groups and persons who refused to answer the question were not allowed to donate. Additionally, the lymph nodes of prospective donors were examined and anyone with swollen lymph nodes was not allowed to donate. The director also testified that, by March 1983, most plasma centers, including his, were testing the donated plasma with at least one surrogate test for the AIDS virus.

The defendant's theory at trial was that it was not negligent because its donor screening and blood testing procedures conformed with the industry custom and practice, that is, the AABB and FDA recommendations and regulations for whole blood centers. In this regard, the defendant presented evidence that its donor screening practice at this time involved giving donors a handout titled "Important Notice" which identified groups at high risk for AIDS, described the signs and symptoms of AIDS, and requested that all prospective donors who were members of a risk group or had symptoms of AIDS refrain from donating blood. Each prospective donor was also asked: "Have you been exposed to a patient with AIDS or to individuals who are at increased risk of contracting AIDS?" and "Have you had night sweating, unexplained skin eruptions or fevers, weight loss or swollen lymph glands?" The donor was prohibited from giving blood if either of these questions were answered in the affirmative.

The jury returned a general verdict in favor of the defendant.

## I.

■ The plaintiffs contend that the trial court erred in ruling that the defendant's conduct should be measured by the professional medical practice standard. We agree.

The essence of the plaintiffs' argument is that the business of blood banking is not a professional medical activity. Thus, they assert, the reasonableness of the defendant's conduct, rather than compliance with accepted and customary practices of blood banks, should govern the determination of their negligence claims.

■ The "professional medical practice" standard has long been recognized in Colorado. *Jackson v. Burnham*, 20 Colo. 532, 39 P. 577 (1895). Under that standard, to determine the liability of a physician, a plaintiff must, in general, establish that the physician failed to possess and exercise that reasonable degree of learning and skill ordinarily possessed and exercised by members of his or her school of medicine in similar circumstances. *Short v. Downs*, 36 Colo.App. 109, 537 P.2d 754 (1975).

Accordingly, in a medical malpractice case, the conduct of the physician is measured against the accepted or customary medical practices of similarly trained and similarly situated physicians, rather than standards of reasonableness determined by judges and juries. Pearson, *The Role of Custom in Medical Malpractice Cases*, 51 Ind.L.J. 528 (1976).

This manner of evaluating negligent conduct, generally referred to as the professional negligence standard, has been applied to a number of other professions as well. *See Lee v. State Board of Dental Examiners*, 654 P.2d 839 (1982) (dentists); *Myers v. Beem*, 712 P.2d 1092 (Colo.App. 1985) (attorneys); *Kellog v. Pizza Oven*,

*Inc.,* 157 Colo. 295, 402 P.2d 633 (1965) (architects).

Here, citing § 13–22–104, C.R.S. (1987 Repl.Vol. 6A), in which blood collection, preparation, and transfusion is characterized as the performance of a "medical service," the trial court ruled that the defendant's conduct should be measured against the professional negligence standard, that is, custom and practice of the "whole blood banking" industry, rather than the ordinary standard of reasonableness. Based on this ruling, the trial court then proceeded to limit evidence on the defendant's negligence to conformance with accepted whole blood banking practices. It disallowed all evidence challenging the reasonableness of these accepted and customary practices, and finally, it instructed the jury that a blood bank's compliance with custom and practice established, as a matter of law, the absence of negligence.

The matters at issue in this appeal are whether § 13–22–104, C.R.S. (1987 Repl. Vol. 6A) does, indeed, establish the standard of care applicable to the practice of blood banking and second, if not, whether there is other support for the trial court's application of the professional negligence standard. We answer both questions in the negative.

### A.

First, we conclude that the statute does not mandate or justify application of the professional negligence standard.

Section 13–22–104, commonly referred to as the Blood Shield Statute, provides in relevant part:

"(1) The availability of scientific knowledge, skills, and materials for the ... transfusion, or transfer of ... blood, or components thereof is important to the health and welfare of the people of this state. Equally important is the duty of those performing such service or providing such materials to exercise due care under the attending circumstances to the end that those receiving health care will benefit and adverse results therefrom will be minimized by the use of available and proven scientific safeguards. The imposition of legal liability without fault upon the persons and organizations engaged in such scientific procedures may inhibit the exercise of sound medical judgment and restrict the availability of important scientific knowledge, skills, and materials. *It is, therefore, the public policy of this state to promote the health and welfare of the people by emphasizing the importance of exercising due care, and by limiting the legal liability arising out of such scientific procedures to instances of negligence or willful misconduct.*

"(2) The donation, whether for or without valuable consideration, the acquisition, preparation, transplantation, injection, or transfusion of any ... blood, or component thereof for or to a human being *is the performance of a medical service and does not, in any way, constitute a sale.* No ... blood bank who donates, obtains, ... injects, transfuses, or otherwise transfers, from one or more human beings, living or dead, to another living human being for the purpose of therapy or transplantation needed by him for his health or welfare shall be liable for any damages of any kind or description directly or indirectly caused by or resulting from any such activity; *except that each such person or entity remains liable for his or its own negligence or willful misconduct.*" (emphasis added)

In interpreting the intended effect of the statute's characterization of blood related activities as a "medical service," we must first consider what objective the legislation is intended to accomplish. *In re Questions by U.S. District Court,* 179 Colo. 270, 499 P.2d 1169 (1972).

Here, the language in § 13–22–104(1), C.R.S. (1987 Repl.Vol. 6A) declares in unambiguous terms that, in the interest of the public's health and welfare, the intended objective of the statute is simply to preclude the imposition of *liability without fault* against persons and entities engaged in scientific procedures which involve human tissue, organs, or blood. Indeed, § 13–22–104 is similar to blood shield stat-

utes in a vast majority of the states which preclude claims against blood banks based on either the theory of strict products liability in tort or breach of warranty. *See St. Luke's Hospital v. Schmaltz,* 188 Colo. 353, 534 P.2d 781 (1975).

When the statute's characterization of blood related activities is viewed in light of this intended objective, it is clear that the statute defines blood related activities as a medical service solely to insure the preclusion of claims which might arise if such activities are characterized as a commercial sale of a product. Indeed, our interpretation of the "medical service" language in § 13–22–104 is supported by cases decided even prior to the statute's enactment. There, the viability of a plaintiff's claims based on liability without fault generally turned on whether the jurisdiction construed a blood transfusion as the sale of a product or the providing of a medical service. *St. Luke's Hospital v. Schmaltz, supra.*

Accordingly, we conclude that no *standard of care* other than negligence or willful misconduct relative to the business of blood banking can be found in, or extrapolated from, the language in § 13–22–104. Rather, that statute affirms that general negligence standards, not product liability standards, shall apply in determining the liability of a blood bank supplying tainted blood.

### B.

Next, we consider whether there is other support for the trial court's application of the professional negligence standard to the industry of blood banking.

The defendant and amici American Red Cross and the Colorado Defense Lawyer's Association admit that no Colorado case has directly addressed the standard of care applicable to the business of blood banking. However, they assert that virtually all the courts which have directly addressed the issue raised by the plaintiffs have held that blood banking is a professional medical activity, governed by a professional standard of care. While defendant and amici have cited numerous cases to illustrate this point, they rely in particular on *Doe v. American Red Cross Blood Services,* 297 S.C. 430, 377 S.E.2d 323 (1989); *Kozup v. Georgetown University,* 663 F.Supp. 1048 (D.D.C.1987), *aff'd in relevant part,* 851 F.2d 437 (D.C.Cir.1988); and *Shelby v. St. Luke's Episcopal Hospital,* 1988 W.L. 28996, 56 U.S.L.W. 2680 (S.D.Tex.1988).

All of these cases involved, as here, claims that the defendant blood bank was negligent in testing blood and screening donors for the AIDS virus. And, in each instance, the defendant blood bank's conduct was measured against its compliance with recognized and accepted practices within the blood banking industry. However, in so holding, the court in *Doe v. American Red Cross Blood Services, supra,* relied on the South Carolina Blood Shield Statute, similar to § 13–22–104. As previously noted, we are not persuaded that the Colorado Blood Shield Statute can, or should, be interpreted this way.

In *Kozup v. Georgetown University, supra,* the plaintiffs argued that the American Red Cross, as a leader in blood banking, should have implemented certain procedures long before any other blood collection center had done so and before the problem of AIDS was readily apparent. The court criticizes this approach as requiring that the Red Cross comply with a "super standard of care." This is not the situation here, where plaintiffs seek only application of the ordinary negligence standard of reasonableness.

In *Shelby v. St. Luke's Episcopal Hospital, supra,* the court adopted, without discussion as to its rationale, a prior physician malpractice case as the basis for applying a professional negligence standard to the plaintiff's claims against the blood bank.

These cases clearly illustrate that, despite the fact that each court adopted the professional negligence standard, each court's analysis in support of this standard varied considerably. Indeed, these inconsistencies in the analysis of the business of blood banking are not limited to the above mentioned cases. *See Kaiser v. Memorial Blood Center of Minneapolis,* 721 F.Supp.

1073 (D.Minn.1989) (Because the individuals who are responsible for blood banking practices are health care professionals, a blood bank is, ipso facto, *a* health care professional such that claims against it are subject to the statute of limitations governing medical malpractice claims); *Contra DiMarco v. Hudson Valley Blood Services*, 141 Misc.2d 59, 532 N.Y.S.2d 488 (N.Y. Sup.Ct.1988), *rev'd on other grounds*, 147 A.D.2d 156, 542 N.Y.S.2d 521 (N.Y.App. Div.1989) (Because there is no physician-patient relationship between the plaintiff and the blood bank, claims against the blood bank are *not* subject to the New York medical malpractice statute of limitations).

■ More significantly, however, none of the defendant's cases rely on, or squarely address, what we perceive to be an essential prerequisite to the application of the professional negligence standard, that the practices and procedures at issue constitute the practice of a profession. Indeed, none of the defendant's cases discuss any elements of professionalism inherent in the business of blood banking which would distinguish it from other industries, trades, and occupations such as pharmacies and pharmaceutical companies, which, like blood banks, may employ medical professionals and provide medical services, but are not deemed a profession. *Cf. Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo. 1984).

The defendant responds that the professionalism of the business of blood banking is based in "reality" and "fact." It notes that blood collection is a recognized area of medical specialization, involving board certified blood banking physicians, pathologists, and hematologists. The defendant further notes that blood donors must be screened through histories and examinations conducted by, or under, the supervision of licensed health care professionals and that the blood is drawn by medical technicians and is subject to scientific procedures administered by personnel with medical training.

While we agree with the defendant that the business of blood banking involves a great number of medical professionals and that *each* such professional's conduct individually should be measured against a professional negligence standard, we do not agree with the defendant that a composite of various types of professionals and technicians transforms the business of blood banking into a profession.

It is generally accepted that professions possess a number of defining characteristics in common, the first and foremost of which is individual autonomy and responsibility. Professionals are usually granted the right to determine the details of how their work will be performed. Moreover, they rely on peers to judge the quality of their work and behavior as professionals. Closely related, and a reflection of the profession's right to determine its own conduct, is that professions generally compose and practice under codes of ethics which define rules of proper behavior.

Other characteristics of a profession include long formal training, undertaken in formalized institutions which are established to transmit the specialized knowledge of the profession and formal recognition of expertise through licensure and certification. R. Hingson, N. Scotch, J. Sorenson, J. Swazey, *In Sickness and in Health, Social Dimensions of Medical Care* (1981).

It is precisely these characteristics of professional activity which have long led the courts to grant the medical profession and other professions a "preferred position" in which the accepted or customary practices of similarly trained and situated professionals are generally taken as conclusive evidence of the professional standard of care. McQuoid, *The Care Required of Medical Practitioners*, 12 Vand.L.Rev. 549 (1959).

The nature of professional activity insures that this professional negligence standard is a *fluctuating* standard defined *only* upon a contemporaneous survey of the practices of the profession's members. The result is a standard which is comprised of the collective knowledge, training, and experience of a series of individuals exercising their independent professional responsibility and judgment and which "on the one hand, does not exact the highest

degree of skill and proficiency attainable in the profession, [but] ... does not, on the other hand contemplate merely average merit." *Holtzman v. Hoy*, 118 Ill. 534, 8 N.E. 832 (1886).

The effect of this preferred position is significant. Not only is the profession essentially allowed to establish its own standard of care, but also it is, in all practical respects, immunized by that standard of care. McQuoid, *supra*. We are not persuaded that the blood banking *industry* possesses the professional characteristics which justify this preferred position.

■ Here, the defendant's theory, which the court accepted, was essentially that it could not be found negligent because its practices were in compliance with the blood banking industry's customs and practices, that is, the AABB and FDA recommendations and regulations. There was undisputed evidence at trial, however, that the AABB recommendations and FDA regulations represented only *minimum* standards and that these standards differed as between whole blood and plasma banks.

Moreover, there was undisputed evidence that the defendant may have unduly lagged behind contemporary professional knowledge in the adoption of new donor and blood screening procedures. Expert testimony established that more rigorous donor screening and blood testing procedures had been successfully implemented and adopted by others in the blood banking industry.

We conclude that this evidence demonstrates that the defendant's compliance with custom and practice in the blood banking industry may not necessarily have constituted reasonable prudence. *Cf. Hernandez v. Nueces County Medical Society*, 779 S.W.2d 867 (Tex.App.1989). However, in defining blood banking as a profession, the trial court effectively insulated the defendant's practices from any effective "reasonableness" challenge. Moreover, this evidence clearly demonstrates that although partially composed of professionals, the blood banking industry itself lacks the defining characteristics of a profession which serve to police and promote the standards, customs, and practices which define a professional standard of care.

In light of the foregoing, the record reveals that, in the blood banking industry, as in other industries, trades, and occupations which issue and rely on written standards and recommendations, the proper role of custom and practice is to illustrate what is feasible, to suggest a body of knowledge of which the defendant should be aware, and to warn of the possibility of far-reaching consequences if any higher standard is required. *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (1965). Custom and practice should not, however, without the safeguards inherent in the practice of a profession, conclusively define the standard of care.

In sum, we conclude that it is the nature of professional practice and activity which supplies both the reason and justification for application of the professional negligence standard in which accepted or customary practices are almost exclusively, the legal standard of care. Neither the case law cited by the defendant nor facts identifying the individual medical professionals and medically trained personnel involved in the blood banking industry persuade us that blood banking is the practice of a profession requiring or justifying application of a professional standard of care.

■ We hold, instead, that ordinary principles of negligence should govern plaintiffs' claims and that the defendant's conduct should be measured against what a reasonable and prudent blood bank would or should have done under the same or similar circumstances. Regulations imposed by government, custom, and practice promulgated by industry associations or arrived at by consensus are merely evidence to be considered in determining the proper standard of care in these cases.

■ Accordingly, we conclude that the trial court erred in applying the professional medical standard of care to defendant's acts, by precluding plaintiffs from presenting evidence which might tend to show that the customs and practices in the defendant's industry might not be reasonable

and prudent, and by instructing the jury that defendant's compliance with these regulations, customs, and practice established, as a matter of law, the absence of negligence.

## II.

■ The plaintiffs next contend that the trial court erred in restricting access to information regarding the blood donor. We disagree.

The plaintiffs argue that the trial court's restriction on access interfered with their ability to establish a causal link between the defendant's failure to screen the donor and plaintiff Susie Quintana's infection and to challenge the defendant's adherence to its own internal procedure.

■ In order to obtain sufficient information regarding a blood bank's screening and testing procedures, a patient is entitled to have controlled access to the donor for discovery, from the donor's perspective, whether screening procedures were followed. *Belle Bonfils Memorial Blood Center v. District Court*, 763 P.2d 1003 (Colo.1988).

Here, the plaintiffs were allowed to ask the donor questions which could have identified him as a member of a high risk group for AIDS. Additionally, the plaintiffs were given copies of the defendant's donor's screening procedures and were permitted to ask, among other things, whether such procedures were followed, including whether the donor received the defendant's new AIDS information sheet.

Inasmuch as these questions were sufficient to allow the plaintiffs to discover that, from the donor's view, the defendant's screening procedures were followed, we conclude that the trial court did not abuse this discretion in limiting the plaintiffs' discovery.

## III.

■ Finally, the plaintiffs argue that the trial court erred in excluding on

grounds of relevancy, evidence of the defendant's financial status as it related to feasibility of defendant conducting more extensive testing. We disagree.

Questions of relevancy are vested in the trial court's sound discretion. *People v. Lowe*, 660 P.2d 1261 (Colo.1983). We perceive no abuse in the trial court's ruling.

## IV.

All other issues raised on appeal including the propriety of the jury instructions proceed from the assumption that the trial court applied the proper negligence standard of care. Because we hold otherwise, these issues are now either premature or moot.

The judgment in favor of the defendant is reversed, and the cause is remanded for a new trial to be conducted in accordance with the views expressed in this opinion.

MARQUEZ and HODGES *, JJ., concur.