**UNITED BLOOD SERVICES, A DI-
VISION OF BLOOD SYSTEMS,
INC., Petitioner,**

v.

**Chris and Susie QUINTANA,
Respondents.**

**No. 91SC172.**

Supreme Court of Colorado,
En Banc.

March 23, 1992.

As Modified on Denial of Rehearing
April 13, 1992.

Downey & Douglas, P.C., Arthur H. Downey, Laurel E. Adams, Denver, Lewis & Roca, Steven J. Labensky, Susan M. Freeman, Phoenix, Ariz., for petitioner.

Holland & Hart, A. Bruce Jones, Maureen Reidy Witt, Steven C. Choquette, Denver, for respondents.

Arnold & Porter, P.C., Richard P. Barkley, Denver, for amici curiae American Nat. Red Cross, American Ass'n of Blood Banks, and Council of Community Blood Centers.

Williams, Youle & Koenigs, P.C., Robert E. Youle, Denver, for amici curiae College of American Pathologists, American Soc. of Clinical Pathologists, and Colorado Soc. of Clinical Pathologists.

Vinton, Waller, Slivka & Panasci, Kevin D. Allen, Margaret M. McClellan, Denver, for amici curiae Colorado Trial Lawyers Ass'n and Ass'n of Trial Lawyers of America.

Justice QUINN delivered the Opinion of the Court.

In *Quintana v. United Blood Services*, 811 P.2d 424 (Colo.App.1991), the court of appeals reversed a judgment entered on a jury verdict for the defendant, United Blood Services (UBS), in a negligence action brought by the plaintiffs, Mrs. Susie Quintana and her husband, Chris Quintana. The Quintanas claimed that UBS, a blood bank, was negligent in supplying a hospital with plasma contaminated with the Acquired Immune Deficiency Syndrome (AIDS) virus and that, as a result of UBS's negligence, the contaminated plasma was given to Mrs. Quintana during surgery and that she subsequently became infected with AIDS. The court of appeals held that the trial court erred in construing section 13–22–104, 6A C.R.S. (1987), as imposing a professional standard of care on a blood bank in acquiring, preparing, and transferring human blood or its components for transfusion into a human being and that the trial court, in its evidentiary rulings and jury instructions, also erred by applying the professional standard of care in a manner that rendered UBS's compliance with the professional standard the equivalent of conclusive proof of reasonable care. In place of the professional standard of care applied by the trial court, the court of appeals reasoned that UBS's conduct "should be measured against what a reasonable and prudent blood bank would or should have done under the same or similar circumstances" and that, under that standard of ordinary care, compliance with governmental regulations and industrial customs and practices would merely constitute evidence of reasonable care and would not be conclusive proof on that issue. 811 P.2d at 431. We granted certiorari to review

the decision of the court of appeals. We conclude, as did the court of appeals, that the Quintanas must be granted a new trial, but we do so for reasons different from those relied upon by the court of appeals.

## I.

UBS is a non-profit blood banking division of Blood Systems, Inc., and operates blood centers throughout the western United States. In procuring whole blood, UBS relies strictly on volunteer donors and then processes the blood in the form of whole blood or blood components, such as red blood cells, platelets, and fresh frozen plasma, and supplies the blood or blood components to hospitals. In April 1983 UBS received blood from a donor and then processed the blood for use in medical treatment. The blood was transferred to Southwest Memorial Hospital in Cortez, Colorado.

Approximately one month later, May 27, 1983, Mrs. Quintana suffered a gunshot wound and was taken to Southwest Memorial Hospital, where she underwent emergency surgery. During the surgery she received several units of whole blood and fresh frozen plasma which had been collected and processed by UBS. Approximately one year after the surgery, Mrs. Quintana began to experience a number of symptoms consistent with the presence of the AIDS virus, and in November 1985 she tested positive for the virus. Mrs. Quintana subsequently developed AIDS–Related Complex (ARC), which precedes full blown AIDS, and she ultimately was diagnosed as suffering from AIDS. It was later determined that the donor of the unit of blood collected in April 1983 and given to Mrs. Quintana tested positive for the AIDS virus. UBS learned from the donor's physician that the donor pursued a "gay lifestyle."

Mrs. Quintana and her husband sued UBS for negligence. As pertinent here, the Quintanas predicated their negligence claim on UBS's failure to properly screen the blood donor for potential infection with the AIDS virus through the use of questioning and physical examination and in failing to properly screen the donated blood through surrogate testing. UBS claimed that its screening and testing procedures satisfied the applicable standard of care and denied the allegations of negligence. Much of the ensuing litigation was directed at resolving the appropriate standard of care applicable to UBS's operations. We summarize those aspects of the proceedings relevant to that issue.

## A.

Prior to trial, UBS filed a motion to preclude one of plaintiff's expert witnesses, Doctor Marcus Conant, a dermatologist, from rendering an expert opinion on the standard of care applicable to UBS's blood banking operations. Doctor Conant had extensive experience in AIDS research and had treated between 3,000 and 5,000 patients who either had the AIDS virus, had AIDS–Related Complex, or had full blown AIDS. Doctor Conant served as co-director of the Kaposi's Sarcoma Clinic at the University of California from 1981 to 1985 and was director of the AIDS Clinical Research Center at the University of California from 1983 to 1985. Doctor Conant filed an affidavit stating that he was prepared to testify at trial to the following matters: as of January 1983 there was ample evidence available to the medical community and to national blood banks that the AIDS virus was transmissible in blood and blood products and that transfusion recipients were at risk of contracting AIDS if adequate precautions were not taken by blood banks in screening donors and performing surrogate tests on donated blood; that as of January 1983 there was ample evidence that the highest risk groups for AIDS were homosexual males, intravenous drug users, Haitians, and hemophiliacs and that these groups were known at that time to present the highest risk for transmitting the AIDS virus and thus needed to be more carefully screened and tested before being allowed to donate blood or, at the very least, before their donated blood was released for transfusion; that in early 1983 blood banks ignored the warnings and advice of AIDS experts and were negligent in not imple-

menting more stringent screening and testing procedures then available, such as direct questioning of potential donors and surrogate laboratory testing of donated blood; that as of April 18, 1983, the date the contaminated blood in issue was donated, various segments of the blood banking community failed to take adequate steps and precautions to screen donors and test blood in order to protect the nation's blood supply from contamination with the AIDS virus; and that as of April 18, 1983, blood banks had inappropriately placed the privacy of blood donors over the safety of the nation's blood supply and the safety of transfusion recipients.[1]

The trial court ruled that, pursuant to section 13–22–104(2), 6A C.R.S. (1987), the acquisition, preparation, and transfer of blood and its components for purposes of medical treatment is "the performance of a medical service" and that, consequently, the procedures utilized by UBS in 1983 to protect the blood supply against the risk of AIDS contamination must be evaluated according to the professional standard of the blood banking community rather than the general standard of reasonable care. Because Doctor Conant was not directly practicing in the blood banking industry, the court ruled that he would not be permitted to testify that the screening and testing procedures of the blood banking community were substandard and unreasonably deficient in safeguarding transfusion recipients from AIDS contamination.

**B.**

The case was tried to a jury over a four-week period in 1989. The trial testimony concerning the practices of the blood banking community in procuring and processing blood and the evidence relating to the etiology and epidemiology of AIDS provide the evidentiary framework for the issue before us.

The blood banking industry is involved in the collection, processing, testing, and storage of human blood and blood components. There are two organizational units within the industry, whole-blood centers and source plasma centers. The industry is regulated by the Food and Drug Administration and by the industry itself in the form of guidelines issued by organizations such as the American Association of Blood Banks, the American Red Cross, the Council for Community Blood Centers, and the American Blood Resource Association.[2] The American Association of Blood Banks, to which UBS belongs, accredits member blood banks on the basis of their compliance with its guidelines.

Whole-blood centers collect and process units of whole blood—that is, blood that has not been broken down into its constituent parts—from voluntary donors. Most of the blood collected is separated by the whole blood centers into individual blood components, such as red blood cells, plate-

---

**1.** The Quintanas also intended to present evidence at trial concerning the screening and testing practices used by source plasma centers which, in contrast to a non-profit whole blood center such as UBS, harvest plasma from paid blood donors into units of "source plasma" for further manufacturing into various plasma derivatives, only some of which are used for therapeutic purposes. UBS took the position that source plasma centers and whole blood centers are separate and distinct industries and that the standard of care applicable to its operation in screening blood donors and in testing donated blood should be based on the practices of the blood banking industry, rather than the source plasma collection and manufacturing industry and that, therefore, all evidence involving the practices and procedures of source plasma centers should be excluded. The trial court ruled that the blood banking community included both whole blood centers and source plasma

centers and, at the trial phase of the case, relegated to the jury the determination of whether UBS belonged to one or the other of these groups within the blood banking community.

**2.** The American Red Cross collects approximately one-half of the nation's whole blood supply and is the nation's largest blood bank. Most other blood banks are smaller regional or community blood banks that are organized into the American Association of Blood Banks and the Council of Community Blood Centers. These three organizations—the American Red Cross, the American Association of Blood Banks, and the Council of Community Blood Centers—account for most of the 13 million units of blood collected from volunteer donors in the United States each year. The American Blood Resources Association represents the United States commercial plasma industry.

lets, or plasma. Whole blood is occasionally transfused, but patients more frequently receive transfusions of the individual blood components. Source plasma centers pay their donors to obtain what is referred to as source plasma by a procedure called plasmapheresis. This process, which is more time consuming than the donation of whole blood, involves removing the donor's blood, separating out the plasma, and then returning the red blood cells to the donor. Source plasma is pooled into large lots and then processed into various components, such as the clotting factors used in the treatment of hemophiliacs.

AIDS is a fatal viral disease that destroys the body's T–4 helper cells, which are a type of white blood cell that activates the immune system. Destruction of T–4 cells leaves the affected person susceptible to infection from a number of opportunistic diseases such as *pneumocystis carinii* pneumonia and Kaposi's sarcoma, a rare form of cancer. AIDS was first recognized in the United States in 1981, but at that time the medical community knew neither the cause nor the mode of transmission. It was not until December 1984 that the retrovirus, the Human T–Lymphotropic Virus Type III (now referred to as the Human Immunodeficiency Virus (HIV)), was isolated and identified as the cause of AIDS.

What was known in 1981 and 1982 is that certain groups of persons were at a high risk for contracting AIDS. These groups included homosexual and bisexual men, intravenous drug users, and recently arrived Haitians. The first reports of the possibility of blood transmission of AIDS began to appear in mid–1982 in a series of articles published by the United States Public Health Service Centers for Disease Control, a federal agency that tracks and facilitates responses to disease. Specifically, in July 1982 the Centers for Disease Control published an article in the *Morbidity and Mortality Weekly Report* entitled *"Pneumocystis carinii* Pneumonia among Persons with Hemophilia A."* 31 M.M.W.R. 365–67 (July 16, 1982). This article described the cases of three persons with hemophilia who had developed AIDS, and concluded by stating that "[a]lthough the

cause of severe immune dysfunction is unknown, the occurrence among the three hemophiliac cases suggests the possible transmission of an agent through blood products." In December 1982, the Centers for Disease Control published another article in the *Morbidity and Mortality Weekly Report* entitled "Possible Transfusion–Associated Acquired Immune Deficiency Syndrome." 31 M.M.W.R. 652–54 (December 10, 1982). This article reported that an infant who had received multiple transfusions at birth had developed AIDS and that an investigation revealed that one of the nineteen donors of the blood was subsequently diagnosed as infected with AIDS. The report concluded by stating: "This report and continuing reports of AIDS among persons with hemophilia A raise serious questions about the possible transmission of AIDS through blood and blood products." The Centers for Disease Control published other articles in 1982 which raised similar questions about the risk of transmitting AIDS through blood and blood products.

In response to the growing concern about the possibility of blood-borne transmission of AIDS, the Centers for Disease Control on January 4, 1983, convened a meeting to discuss the extent of the problem and possible ways to protect the nation's blood supply. Present at this meeting were representatives from the Food and Drug Administration, the American Red Cross, the American Association of Blood Banks, the Council of Community Blood Centers, the National Hemophilia Foundation, the National Gay Task Force, and the Pharmaceutical Manufacturer's Association. A number of safety measures were discussed at this meeting, but there was no consensus as to the usefulness of those measures and the meeting ended without any recommendations being made. On January 13, 1983, the American Red Cross, the American Association of Blood Banks, and the Council of Community Blood Banks issued a "Joint Statement on Acquired Immune Deficiency Syndrome Related to Transfusion." Although the joint statement concluded that "evidence

for transmission [of AIDS] by blood transfusion is inconclusive at this time," it suggested that, in light of the possibility of transmission by blood transfusion, donor screening should include specific questions to detect possible exposure to AIDS and questions designed to elicit a history of nightsweating, unexplained fevers, unexpected weight loss, lymphadenopathy (swollen lymph nodes), and Kaposi's sarcoma. The recommendations stated that "direct or indirect questions about a donor's sexual preference are inappropriate" because such inquiries would constitute an invasion of privacy and would be ineffective in eliminating AIDS-infected donors. The recommendations did not include routine implementation of a laboratory screening program because it was felt that such screening had not yet been proven effective and could reduce the available blood supply without enhancing safety. Nor did the statement recommend the employment of surrogate testing. A surrogate test is used when there is no direct test available to detect the presence of a disease or the antibody generated by the disease. Surrogate testing is thus utilized to determine the presence of factors believed to be statistically linked to the presence of a disease.[3]

On January 14, 1983, the National Hemophilia Foundation issued a memorandum containing recommendations to prevent AIDS in patients suffering from hemophilia. The foundation recommended that manufacturers of Factor VIII concentrate, a coagulating agent used by hemophiliacs, implement direct questioning of blood donors and evaluate and implement surrogate testing of donated blood in order to reduce the risk of AIDS transmission. Source plasma centers thereafter initiated aggressive donor screening by asking if the donor was homosexual, an intravenous drug-user, had recently arrived from Haiti, or was a hemophiliac. In addition, source plasma centers began to examine donors for lymphadenopathy, which is symptomatic of ARC and AIDS, and also began to implement surrogate testing of blood.

On March 24, 1983, approximately one month before the AIDS-infected donor donated the blood that was later administered in plasma form to Mrs. Quintana, the Food and Drug Administration issued a memorandum to "all establishments collecting human blood for transfusion" and a separate memorandum to "all establishments collecting source plasma." The Food and Drug Administration at that point in time had not issued any regulations regarding AIDS, and the March 1983 memorandum consisted of recommendations only.[4] The memorandum to blood centers began by acknowledging that "the Acquired Immune Deficiency Syndrome (AIDS) has caused serious concern among members of the blood banking community because of the implications for transfusion recipients if this disease is proven to be transmissible by blood or blood products." The memorandum recommended that blood centers institute additional measures "designed to decrease blood collection from individual donors and donor groups known to be at

---

**3.** Evidence at trial indicated that the various surrogate tests would correctly identify between 66 percent and 88 percent of AIDS-infected donors. The tests, however, had a two to five percent false-positive rate, which would result in a rejection of uninfected blood and would thereby diminish the nation's blood supply. One surrogate test is the Hepatitis B Core Antibody Test, which screens for antibodies to hepatitis, a disease frequently present in people with AIDS. Another surrogate test is the T–4/T–8 Cell Ratio Test. There are two types of T-cells, helper cells that turn on the immune system and suppressor cells that shut down the system. Because AIDS patients may have a greater number of suppressor cells than helper cells, the T–4/T–8 surrogate test can be used to check for

the presence of this condition associated with persons infected with the AIDS virus.

**4.** The FDA regulations then in effect, 21 CFR §§ 600–680 (1983), dealt generally with the standard operating procedures that blood banks and plasma centers were required to follow in collecting and processing blood and blood components and in testing for diseases known to be transmitted via blood, such as hepatitis. The FDA regulations did provide, however, that any facility could use the standard operating procedures of associations such as the American Association of Blood Banks and the American Red Cross, so long as "such specific procedures are consistent with and at least as stringent as [FDA] requirements." 21 CFR § 606.100(d).

increased risk for transmitting AIDS," and to include in these measures the following: educational programs to inform persons at increased risk of AIDS—namely, persons with symptoms and signs suggestive of AIDS, sexually active homosexual and bisexual men with multiple partners, Haitian entrants to the United States, intravenous drug users, and sexual partners of individuals at increased risk of AIDS—that they should refrain from blood donations because of the potential risk to transfusion recipients, at least until such time as the AIDS problem is resolved or definitive tests become available; re-education of personnel responsible for donor screening to recognize the early signs and symptoms of AIDS and to include in the medical history of donors "specific questions designed to detect possible AIDS symptoms or exposure to patients with AIDS," including a history of night sweats, unexplained fevers, unexpected weight loss, or signs of lymphadenopathy or Kaposi's sarcoma; and standard operating procedures which specifically inform the blood bank staff that all blood or blood products inadvertently collected from a donor known or suspected of having AIDS "should be considered potentially highly infectious and must be immediately quarantined and disposed of expeditiously unless designated for investigative use related to AIDS."

The Food and Drug Administration's memorandum to source plasma centers contained similar recommendations concerning the educational programs calculated to inform donors of the risk of AIDS transmission and the re-education of personnel responsible for donor screening in identifying the early signs and symptoms of AIDS by eliciting appropriate medical history. In addition, the source-plasma recommendations included a physical examination of plasma donors for swollen lymph nodes and weight monitoring for any sudden and unexplained weight loss. If a donor experienced any significant and unexplained decrease in weight, the recommendations stated that the donor should be referred to a physician for a complete evaluation and that any plasma in storage previously collected from the donor "should be quarantined until the physician's evaluation is completed." In addition, the memorandum stated that "[r]evised labeling for plasma collected from high risk donor groups and intended for further manufacture of plasma derivatives should be submitted to the Office of Biologics."

### C.

The evidence at trial indicated that in April 1983, when the blood donation in question was given, UBS had revised its donor screening process in response to the Food and Drug Administration's recommendations. The screening procedures followed by UBS at this time included the following: (1) providing prospective donors with specific information about AIDS, the groups at risk, and signs and symptoms of the disease, and then requesting that prospective donors defer themselves if appropriate; (2) specific questioning of donors as to whether they understood the AIDS information and whether they were in good health at that time; (3) examining donors for skin lesions or intravenous needle tracks; (4) deferring those donors who had exposure to malaria or hepatitis B and thereby screening out Haitians and many homosexuals; (5) asking questions designed to elicit symptoms of the disease; (6) directing recruitment efforts away from high risk groups; and (7) educating the public as to groups at risk and the danger posed by members of such groups donating blood.

Doctor Earnest Simon, executive vice president for medical affairs for Blood Systems, Inc.,[5] testified that UBS's revised procedures implemented the Food and Drug Administration recommendations. In addition to modifying its donor screening procedures, UBS also began conducting a study to evaluate surrogate testing. Doctor Paul Holland, the medical director and chief executive officer of Sacramento Medical Foundation Blood Center, testified that in his opinion UBS's practices and procedures in 1983 met and in some cases ex-

---

**5.** As previously indicated, UBS is an operating division of Blood Systems, Inc.

ceeded the standard of care for blood banks as defined by the FDA recommendations and the joint statement issued in January 1983 by the American Red Cross, the American Association of Blood Banks, and the Council of Community Blood Banks. The technician who interviewed the donor of the infected blood given to Mrs. Quintana testified that the donor screening form indicated that she had complied with all the revisions in interviewing the donor. The screening procedures utilized at this time by UBS, however, did not include the aggressive questioning and physical examination of blood donors as recommended by the National Hemophilia Foundation. Nor did UBS at this time employ surrogate testing of donated blood, as had been instituted by source plasma centers in early 1983.

It was established at trial that the donor of the blood used in the treatment of Mrs. Quintana was served with the following written interrogatory under oath prior to trial:

Assume that the following questions had been read to you on April 18, 1983:

a. Have you ever had sexual contact with someone who had received a blood transfusion?

b. Have you ever had sexual contact with someone who is in a group at high risk of AIDS or exposure to AIDS?

c. Have you ever visited Haiti?

d. Have you ever injected drugs into your vein(s)?

e. Have you ever had sex with a man since 1978?

f. Are you a hemophiliac?

If these questions had been read to you, would your answer to any of these questions have been "yes"? (you do not need to specify which question, if any, you would have answered in the affirmative.)

The donor, whose identity remained confidential, responded "yes" to the interrogatory.

Based on the trial court's pretrial ruling, the Quintanas were not permitted to present testimony from Doctor Conant as to the allegedly substandard character of the screening and testing procedures utilized by the blood banking industry at the time the donation in question was obtained by UBS. The court also refused to permit the Quintanas to present testimony from another expert witness, Doctor Thomas Asher, a microbiologist, who had performed epidemiological research for the Centers for Disease Control and had thirty years experience in the blood banking industry. Doctor Asher would have testified that the screening and testing procedures utilized by the entire blood banking industry in April 1983 were substandard and unreasonably deficient in guarding against the transmission of AIDS through blood transfusion.[6] In addition, the trial court refused to permit the Quintanas from eliciting testimony from Doctor Edgar Engleman, the Director of Stanford University Blood Bank, to rebut UBS's expert opinion evidence on the standard of care. The court, however, did permit Doctor Engleman to testify on rebuttal concerning surrogate testing and whether, in his opinion, it was an effective safeguard against AIDS-transmission.

### D.

At the conclusion of the evidence, the trial court instructed the jury in Jury Instruction No. 20, over the Quintanas' objection, that "negligence means the failure to meet the standard of care of other establishments in the industry at that time, as established by the testimony of one or more expert witnesses." Jury Instruction No. 20 also stated that the jury, in determining the standard of care, must first determine "what constitutes the industry involved"—that is, whether, as the Quintanas contend, "the industry consists of fresh blood centers and plasma centers," or, as UBS contends, "the industry consists of

---

**6.** Although the trial court precluded Doctor Asher from offering his opinion on the unreasonably deficient screening and testing procedures used by the blood banking industry, the court did permit the doctor to testify concerning the relationship between whole blood centers and source plasma centers and what the standard of care for the entire industry was in 1983.

fresh blood centers only and that plasma centers are a separate industry with its own standard of care." Instruction No. 20 then concluded as follows:

[Y]ou cannot set up a standard of care on your own, but you must be guided in that regard solely by the experts who have appeared for the parties in this case, in accordance with the standard of care of the industry as you find it to be.

If you find there is one industry, you may, however, find there are two schools of thought which meet the standard of care. UBS must meet the standard of care of the school of thought to which it belongs.

The trial court also instructed the jury in Instruction No. 21, again over the Quintanas' objection, as follows:

Where, under the usual practice of the profession of the defendant, United Blood Services, different courses of procedure are available which might properly and reasonably be used to meet the standard of care, the blood center must use its best judgment as to the choice of procedure.

A blood center is not negligent because of its selection of a particular course of procedure, if its selection is consistent with the skill and care which other blood centers would use at the same time in the same or similar circumstances to meet the standard of care in the industry.

The jury returned a general verdict in favor of UBS, and the trial court entered judgment on the verdict.[7]

### E.

The Quintanas appealed to the court of appeals, which reversed the judgment and remanded the case for a new trial. The court of appeals held that, contrary to the trial court's pretrial ruling, section 13–22–104(2), 6A C.R.S. (1987), incorporates no standard of liability other than "negligence or willful misconduct." *Quintana*, 811 P.2d at 429. Proceeding from that premise, the court of appeals concluded that the trial court erred in its evidentiary rulings and in its jury instructions, both of which incorporated a professional standard of care which could be established only by testimony of experts familiar with the recognized and accepted practices within the blood banking industry. It was the court of appeals' view that the blood banking industry, although partially composed of professionals, lacks the defining characteristics of a profession and that the accepted or customary practices of similarly trained and situated professionals should not have been considered as conclusive evidence of the professional standard of care applicable to UBS's conduct. *Id.* at 430–31. Based on that reasoning, the court of appeals held as follows:

We hold ... that ordinary principles of negligence should govern plaintiffs' claims and that the defendant's conduct should be measured against what a reasonable and prudent blood bank would or should have done under the same or similar circumstances. Regulations imposed by government, custom, and practice promulgated by industry associations or arrived at by consensus are merely evidence to be considered in determining the proper standard of care in these cases.

Accordingly, we conclude that the trial court erred in applying the professional medical standard of care to defendant's acts, by precluding plaintiffs from presenting evidence which might tend to show that the customs and practices in the defendant's industry might not be reasonable and prudent, and by instructing the jury that defendant's compliance with these regulations, customs, and practice established, as a matter of law, the absence of negligence.

*Id.* at 431–32.

We granted UBS's petition for certiorari to consider whether the court of appeals erred in holding that ordinary principles of

---

7. The Quintanas also had filed malpractice claims against two of Mrs. Quintana's treating physicians. The jury returned a verdict for Mrs. Quintana against one of the physicians for $55,- 000 and a verdict for Mr. Quintana in the amount of $15,000 for loss of consortium. Those claims are not involved in any way in the instant proceeding.

reasonable care, rather than a professional standard of care, should be the appropriate measure against which to evaluate UBS's conduct in procuring and processing the AIDS-contaminated blood donation later administered to Mrs. Quintana in the form of frozen plasma during her surgery.

## II.

The resolution of this case turns on the proper construction of the statutory text of section 13–22–104, 6A C.R.S. (1987), which addresses a blood bank's responsibility for the acquisition, preparation, and transfer of human blood or its components for medical transfusion into a human being. Before addressing whether the statutory scheme contemplates a professional standard of care or an ordinary standard of reasonable care, and before resolving the significance of the particular standard to the trial court's evidentiary rulings and jury instructions, we first review the basic principles of tort law bearing on the standard of care.

## A.

■ A cause of action in tort arises out of a violation of a legal duty imposed upon an actor to avoid causing harm to others. The question of legal duty is a question of law. "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980). "A court's conclusion that a duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to

protection.'" *University of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo.1987) (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 53, at 358 (5th ed. 1984)). In order to recover in tort, a plaintiff must prove not only an existence and breach of a legal duty owed by the defendant but also causation and damages. *Perreira v. State,* 768 P.2d 1198, 1208 (Colo.1989); *Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986).

■ Legal duty is defined in terms of a standard of care. The source of the duty and the corresponding standard essential to the proper discharge of the duty may originate from a judicial decision or a legislative enactment. *Dare v. Sobule,* 674 P.2d 960, 963 (Colo.1984).[8] Our case law, for example, has espoused the general principle that a legal duty to use reasonable care arises in response to a foreseeable and unreasonable risk of harm to others. *Lyons v. Nasby,* 770 P.2d 1250, 1254 (Colo.1989); *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46–50 (Colo.1987). Thus, in ordinary negligence cases, an actor is required to conform his or her conduct to a standard of objective behavior measured by what a reasonable person of ordinary prudence would or would not do under the same or similar circumstances. *See* W. Keeton et al., *Prosser and Keeton on Torts* § 32, at 174. For those practicing a profession involving specialized knowledge or skill, reasonable care requires the actor to possess "a standard minimum of special knowledge and ability," *id.* at 185, and to exercise reasonable care in a manner consistent with the knowledge and ability possessed by members of the profession in good standing. *Klimkiewicz v. Karnick,* 150 Colo. 267, 273–74, 372 P.2d

---

**8.** In some situations the General Assembly has elected to impose a standard of care substantially different from the standard which otherwise would apply under judicially developed tort doctrine. *See, e.g.,* § 12–47–128.5, 5B C.R.S. (1991) (abolition of common-law action against vendor of alcoholic beverages for injury to purchaser or others caused by purchaser's intoxication, except where vendor willfully and knowingly sold or served alcoholic beverages to purchaser under age or visibly intoxicated); § 13–21–115, 6A C.R.S. (1991 Supp.) (landowner liable in tort to trespassers only for injuries willfully or deliberately caused); § 13–21–117, 6A C.R.S. (1987) (mental health care professional not liable in tort for damages resulting from failure to warn any person of mental health patient's violent behavior except where patient has communicated to health care professional a serious threat of imminent physical violence against specific person or persons).

736, 739 (1962); *Brown v. Hughes*, 94 Colo. 295, 303–04, 30 P.2d 259, 262 (1934).

 A practicing professional is generally entitled to be judged according to the tenets of the school of practice which the practitioner professes to follow. Because in most cases of professional negligence the applicable standard is not within the common knowledge and experience of ordinary persons, the applicable standard must be established by expert testimony. *See, e.g., Melville v. Southward*, 791 P.2d 383, 387 (Colo.1990); *Daly v. Lininger*, 87 Colo. 401, 405, 288 P. 633, 636 (1930). "Without expert opinion testimony in such cases, the trier of fact would be left with no standard at all against which to evaluate the defendant's conduct." *Melville*, 791 P.2d at 387.

Colorado case law reflects several positions with respect to the compass of the professional community by which a professional standard of care is to be established. Some cases have adopted the so-called "locality rule," which requires that a health care professional be bound by the knowledge and skill applicable to those practicing the same profession in the same locality. *See, e.g., Foose v. Haymond*, 135 Colo. 275, 283, 310 P.2d 722, 726 (1957); *Brown v. Hughes*, 94 Colo. at 303, 30 P.2d at 262. Other cases describe the professional community as those practicing the same specialty in the same or similar community. *E.g., Bloskas v. Murray*, 646 P.2d 907, 914 (Colo.1982); *Martin v. Bralliar*, 36 Colo. App. 254, 258, 540 P.2d 1118, 1120 (1975). Some cases also refer to a national community and state that a national standard, if existing, is applicable when measuring the particular professional practice under consideration. *See Mallett v. Pirkey*, 171 Colo. 271, 282, 466 P.2d 466, 471 (1970); *Martin*, 36 Colo.App. at 258–59, 540 P.2d at 1120; *Stauffer v. Karabin*, 30 Colo.App. 357, 364, 492 P.2d 862, 865 (1971).

 While a defendant practicing a profession is entitled to be judged by the standard of care applicable to the professional school to which the defendant belongs, W. Keeton, et al., *Prosser and Keeton on Torts* § 32, at 187, that standard is not always conclusive proof of due care. We

have held, in a somewhat different context, that compliance with administrative safety regulations is a circumstance to be considered on the issue of due care but is not conclusive proof of that issue. *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 591 (Colo.1984) (citing with approval § 288C of *Restatement (Second) of Torts* (1965), which states that compliance with statute or administrative regulation not preclusive of finding of negligence). Judge Learned Hand, in addressing this problem of insulating a particular calling's standard of care from any challenge whatever, put the matter this way:

> There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves.... Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*The T.J. Hooper*, 60 F.2d 737, 740 (2nd Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932) (citations omitted). If the standard adopted by a practicing profession were to be deemed conclusive proof of due care, the profession itself would be permitted to set the measure of its own legal liability, even though that measure might be far below a level of care readily attainable through the adoption of practices and procedures substantially more effective in protecting others against harm than the self-decreed standard of the profession. *See, e.g., Townsend v. Kiracoff*, 545 F.Supp. 465, 468 (D.Colo.1982) (recognizing rule that even if hospital acted in accordance with community standard of care, plaintiff still entitled to prove at trial that entire community standard is negligent); *Favalora v. Aetna Casualty & Surety Co.*, 144 So.2d 544, 551 (La.App.

1962) (holding that medical practitioner may not avoid liability simply by adhering to the custom or procedure of similar practitioners when such practice is found to be negligent; "[t]o hold otherwise is to exempt one even from willful negligence on the patently unsound ground that others in the same profession do likewise"); *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206, 217 (Pa.1971) (recognizing that if the medical profession were allowed to set its own standard of conduct by establishing its own custom of practice, then no matter how unreasonable such standard may be by ordinary standards, all members of profession would be insulated from liability so long as they conform to the norm); *cf. Denver & Rio Grande W. R.R. Co. v. Lloyd*, 148 Colo. 1, 6, 364 P.2d 873, 876 (1961) (recognizing as axiomatic the general proposition that "one may not promulgate rules or establish customs, practices, or usage, or adopt constructions thereof so as to absolve himself of his own negligence").

### B.

■■■■ To be sure, there is a presumption that adherence to the applicable standard of care adopted by a profession constitutes due care for those practicing that profession. The presumption, however, is a rebuttable one, and the burden is on the one challenging the standard of care to rebut the presumption by competent evidence. *See* CRE 301. In a professional negligence case, therefore, a plaintiff should be permitted to present expert opinion testimony that the standard of care adopted by the school of practice to which the defendant adheres is unreasonably deficient by not incorporating readily available practices and procedures substantially more protective against the harm caused to the plaintiff than the standard of care adopted by the defendant's school of practice. A plaintiff may establish that proposition by the opinion testimony of a qualified expert practicing in the same school or by the opinion testimony of an expert practicing in another school if the expert is sufficiently familiar with the standard of care applicable to the school in question as to render the witness's testimony as well-informed on the applicable standard of care as would be the opinion of an expert witness practicing the same profession as the defendant, or if the standard of care at issue is substantially identical to both schools of practice. *Melville*, 791 P.2d at 388–89.

■■■■ If the plaintiff offers competent and credible evidence that the professional standard of care adopted by the school of practice to which the defendant adheres is unreasonably lacking in readily available safeguards offering substantially more protection against the harm caused to the plaintiff, the issue of whether the standard of care adopted by the defendant's school constitutes due care is a question for the jury to resolve under appropriate instructions. If the jury is convinced by a preponderance of the evidence that the standard of care adopted by the defendant's school of practice is unreasonably deficient, it must resolve the issue of the defendant's negligence on the basis of all the evidence concerning the practices and procedures available to the defendant's profession under the circumstances existing at the time of the events in question. If, on the other hand, the jury is not convinced by a preponderance of the evidence that the standard of care adopted by the defendant's school is unreasonably deficient, the jury must accept the standard of the defendant's school of practice as conclusive evidence of reasonable care and must determine the issue of negligence on the basis of the defendant's compliance or noncompliance with that standard.

### III.

We turn now to whether, as the court of appeals concluded, UBS's conduct should be measured by the general negligence standard of ordinary reasonable care or whether, as the trial court ruled, UBS's conduct should be measured by a professional standard of care applicable to the blood banking community to which UBS

belongs.[9] Resolution of that question requires us to focus on the statutory text of section 13–22–104, 6A C.R.S. (1987), which states in pertinent part as follows:

(1) The availability of scientific knowledge, skills, and materials for the ... transfusion ... of human ... blood, or components thereof[,] is important to the health and welfare of the people of this state. Equally important is the duty of those performing such service or providing such materials to exercise due care under the attending circumstances to the end that those receiving health care will benefit and adverse results therefrom will be minimized by the use of available and proven scientific safeguards. The imposition of legal liability without fault upon the persons and organizations engaged in such scientific procedures may inhibit the exercise of sound medical judgment and restrict the availability of important scientific knowledge, skills, and materials. It is, therefore, the public policy of this state to promote the health and welfare of the people by emphasizing the importance of exercising due care, and by limiting the legal liability arising out of such scientific procedures to instances of negligence or willful misconduct.

(2) The donation, whether for or without valuable consideration, the acquisition, preparation, ... or transfusion of any human ... blood, or component thereof[,] for or to a human being is the performance of a medical service and does not, in any way, constitute a sale. No ... blood bank ... [which] donates, obtains, prepares, ... transfuses, or otherwise transfers, or [which] assists or participates in donating, obtaining, preparing, ... transfusing, or transferring any ... blood, or component thereof[,] from one or more human beings, living or dead, to another living human being

for the purpose of therapy ... needed by him for his health or welfare shall be liable for any damages of any kind or description directly or indirectly caused by or resulting from any such activity; except that each such person or entity remains liable for his or its own negligence or willful misconduct.

In urging reversal of the judgment of the court of appeals, UBS argues that a professional standard of care, rather than a standard of ordinary and reasonable care, should apply to a blood bank's conduct in procuring and processing human blood for subsequent use in a medical transfusion and that, consistent with that standard, compliance with the customs and practices applicable to the blood banking community to which UBS belongs should be conclusive proof of due care. The Quintanas, in defense of the court of appeals' analysis, contend that blood banking is not a professional medical activity and that, therefore, the reasonableness of UBS's conduct should be measured under ordinary principles of negligence, pursuant to which compliance with the accepted and customary practices of the blood banking community is merely evidence of reasonable care. For reasons hereinafter discussed, we conclude that section 13–22–104 imposes a professional standard of care on a blood bank in procuring and processing human blood for use in a subsequent transfusion during medical treatment but that, under the particular circumstances of this case, such standard should not have been considered as conclusive proof of due care on the part of UBS.

### A.

A court's primary task in construing a statute is to give effect to legislative intent or purpose. *E.g., Gallegos v. Phipps*, 779 P.2d 856, 861 (Colo.1989); *Col-*

---

9. We previously considered the tort liability of a hospital for furnishing defective blood for transfusion to a patient, *St. Luke's Hosp. v. Schmaltz*, 188 Colo. 353, 534 P.2d 781 (1975), and also the warranty liability of a blood bank for the sale of contaminated blood, *Belle Bonfils Memorial Blood Bank v. Hansen*, 195 Colo. 529, 579 P.2d 1158 (1978), and still later in *Belle Bonfils Me-*

*morial Blood Bank v. Hansen*, 665 P.2d 118 (Colo.1983), the applicability of the "unavoidably unsafe product" defense to a strict liability claim predicated on section 402A of the *Restatement (Second) of Torts*. These cases, however, involved transactions that occurred prior to the enactment of section 13–22–104 in 1971.

*orado Common Cause v. Meyer,* 758 P.2d 153, 160 (Colo.1988). The primary source for statutory interpretation is the statutory text itself. Section 13–22–104 expresses a twofold purpose: one purpose is to foster the development of medical services, and to make those services more available to health care recipients, by relieving blood banks from unduly rigid standards of legal liability; the other is to minimize the risk of harm to health care recipients by requiring a blood bank to exercise due care by utilizing "available and proven scientific safeguards" in its operations.

Because uncontaminated blood and blood components are essential to effective medical care, section 13–22–104(2) defines the acquisition, preparation, or transfusion of blood "for or to a human being" as a performance of a "medical service" and thereby exempts a blood bank from warranty liability arising from the sale of human blood or its components. In addition, by expressly limiting the legal liability of a blood bank to instances of "negligence or willful misconduct," the statute exempts a blood bank from strict liability in tort for a claim predicated on section 402A of the *Restatement (Second) of Torts.*

■■■■ Section 13–22–104(1) imposes on a blood bank the duty "to exercise due care under the attending circumstances to the end that those receiving health care will benefit and adverse results therefrom will be minimized by the use of available and proven scientific safeguards." This statutory terminology equates a blood bank's duty of reasonable care with the use of "available and proven scientific safeguards" in acquiring, preparing, or transferring human blood or its components for use in medical treatment. Negligence in the abstract consists of a failure to exercise reasonable care in order to protect others from harm. *See generally* W. Kee-

ton et. al., *Prosser and Keeton on Torts* § 31, at 169–70. A blood bank is liable in negligence, therefore, when it fails to make use of, or makes unreasonable use of, available and proven scientific safeguards in the course of acquiring, preparing, or transferring human blood or its components for use in medical treatment.[10]

■■ Because section 13–22–104(2) expressly categorizes the acquisition, preparation, and transfer of human blood or its components for medical transfusion as "the performance of a medical service," the statutory scheme clearly contemplates that a blood bank's conduct in procuring or processing blood is to be measured by a professional standard of care. Although there possibly might be situations where a blood bank's decision to market human blood or its components for use in medical transfusion might solely involve business considerations within the knowledge and experience of the average person, rather than specialized knowledge or skill unique to a scientific discipline, *see Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 210 (Colo.1984), we deal in this case with a negligence claim based on a blood bank's failure to properly screen blood donors and to properly test donated blood for the AIDS virus. The acquisition and preparation of human blood for use in medical transfusion and the safeguarding of donated blood against contamination require the exercise of medical and scientific expertise by health care professionals in both the donor screening and the blood testing stages of the process. Any alleged negligence of a blood bank in performing those operations can occur only by reason of the action or inaction of its officers and employees functioning as health care professionals.

We thus hold that UBS's conduct in acquiring and testing the blood subsequently used in treating Mrs. Quintana must be

10. Willful misconduct consists of conduct purposely committed under circumstances where the actor realizes that the conduct is dangerous but nonetheless engages in the conduct without regard to the safety of others. *See Tri–Aspen Constr. Co. v. Johnson,* 714 P.2d 484, 486 (Colo. 1986). A blood bank acts with willful misconduct when it purposely fails to make use of, or

purposely makes improper use of, available and proven scientific safeguards in acquiring, preparing, or transferring human blood or its components for use in medical treatment and when it does so with a reckless disregard of the harmful effects that its conduct can cause to the recipient of its product.

judged by a professional standard of care established by expert testimony. Our conclusion that UBS's conduct involves a professional standard of care finds support in the medical and scientific nature of donor screening and blood testing, in the plain terms of section 13–22–104—which, as explained above, classifies a blood bank's operation as a "medical service" and equates reasonable or due care with the use of "available and proven scientific safeguards"—and in the case law of other jurisdictions. *See, e.g., Sawyer v. Methodist Hosp.*, 522 F.2d 1102, 1105 (6th Cir.1975) (applying professional standard of care to blood bank); *Tufaro v. Methodist Hosp., Inc.*, 368 So.2d 1219 (La.App.1979) (reasoning that because a blood transfusion is a medical procedure, the standard of care is logically the same as that applicable to actions of physicians and surgeons); *Hutchins v. Blood Services of Montana*, 161 Mont. 359, 506 P.2d 449, 451–52 (1973) (applying professional standard of care to blood bank); *Doe v. American Red Cross Blood Services, S.C. Region*, 297 S.C. 430, 377 S.E.2d 323, 326 (1989) (reasoning that since transfusion of blood is characterized as a medical service, blood collector and processor should be treated as professional).

In April 1983, when the blood donor gave blood to UBS, the blood banking community was organized on a national level and its procedures were based primarily on scientific data promulgated by the Centers for Disease Control, on guidelines issued by the Food and Drug Administration, and on standards developed by the American Association of Blood Banks in conjunction with such groups as the American Red Cross, the Council of Community Blood Centers, and the National Hemophilia Foundation. UBS was a member of this national community and, as such, was subject to a national professional standard applicable to the blood banking community. The court of appeals, therefore, erred by concluding that UBS's conduct should be measured against the general nonprofessional standard of reasonable care rather than the national professional standard of care applicable to the blood banking community of which UBS was a member.

### B.

The fact that the court of appeals erred in its adoption of a general standard of reasonable care does not mean that it also erred in ordering a new trial. We are satisfied that the trial court, after having correctly ruled that a professional standard of care applied to UBS's conduct, erroneously applied that standard in a manner that effectively precluded the Quintanas from establishing that the national blood banking community's standard of care was itself unreasonably deficient in not incorporating available safeguards designed to provide substantially more protection against the risk of infecting a transfusion recipient with AIDS.

At the time of the events underlying the instant litigation, scientific information on the etiology and epidemiology of AIDS was in the developmental stages. There did not exist at that time what might be characterized as "state of the art" screening and testing procedures, but articles published in 1982 by the Centers for Disease Control clearly suggested that AIDS well might be transmitted through blood and blood products. Three months prior to the blood donation involved in this case, the national blood organizations issued a joint statement suggesting that, in light of the possibility of AIDS transmission by blood transfusion, donor screening should include specific questions calculated to detect the potential donor's possible exposure to AIDS and physical symptoms correlated with AIDS. At about the same time, the National Hemophilia Foundation recommended to the manufacturers of the coagulating agent Factor VIII that they implement direct questioning of blood donors and evaluate and implement surrogate testing of blood in order to reduce the risk of AIDS transmission. Source plasma centers, acting on the above information, began to implement aggressive screening procedures by asking donors if they were homosexual, intravenous drug users, recent arrivals from Haiti, or hemophiliacs, and

also began to employ surrogate testing of donated blood. It is also noteworthy that in March 1983, the Food and Drug Administration issued recommendations calculated to decrease the risk of transmitting AIDS through donated blood and source plasma. In the case of whole blood centers, it was specifically recommended that donor screening personnel be educated in recognizing the early signs and symptoms and in directing appropriate questions to donors designed to detect possible AIDS symptoms or exposure to AIDS. The recommendations also stated that the blood center's staff should be informed that "all blood or blood products inadvertently collected ... from a donor known or suspected of having AIDS should be considered potentially highly infectious and must be immediately quarantined and disposed of expeditiously unless designated for investigative use related to AIDS." In the case of source plasma centers, the recommendations included, in addition to specific questions designed to detect possible AIDS symptoms or exposure to AIDS, a physical examination of a donor for swollen lymph nodes and monitoring of a donor for significant and unexplained weight loss.

■ In the instant case, UBS's compliance with the Food and Drug Administration's recommendations and with the guidelines developed by the national blood banking community was some evidence of due care, but was not conclusive proof that additional precautions were not required. *See Blueflame Gas,* 679 P.2d at 591; *Restatement (Second) of Torts* § 288C (1965). The record shows that the three expert witnesses from whom the Quintanas unsuccessfully sought to elicit opinion evidence— Doctors Conant, Asher, and Engleman— were sufficiently familiar with the standard of care applicable to the national blood banking community as to render their opinions on the need for additional precautions as well-informed as the opinion of an expert engaged in procuring and processing human blood for use in medical treatment. *See Melville,* 791 P.2d at 388– 89. The Quintanas' expert opinion evidence was calculated to show that the national blood banking community's screen-

ing and testing procedures on which UBS relied were unreasonably deficient in guarding against the transmission of the AIDS virus through blood and blood components and that those procedures, in that respect, were not in accordance with the then "available and proven safeguards" designed to be substantially more protective against the risk of transmitting AIDS through contaminated blood. Indeed, given the growing suspicion in the early months of 1983 that the AIDS virus might be transmitted through blood or blood components, and in light of the extreme caution recommended by the Food and Drug Administration and other groups within the blood banking community in dealing with donated blood, as well as the implementation by some blood and plasma centers of substantially stricter screening and testing procedures than those used by the national blood banking community, the significance of the excluded evidence to a fair and informed resolution of this case is compelling.

■ The trial court's ruling prohibiting the Quintanas from offering expert opinion evidence on the unreasonably deficient character of the blood banking community's screening and testing procedures was tantamount to permitting the blood banking community to establish its own standard of legal liability despite the existence of expert opinion evidence tending to show that the blood banking community had adopted unreasonably deficient practices and procedures in place of substantially more protective and readily available safeguards. We hold, therefore, that the trial court's exclusion of the Quintanas' proffered expert opinion evidence was error. *See generally Kirkendall v. Harbor Ins. Co.,* 698 F.Supp. 768, 779 (W.D.Ark.1988) (recognizing reluctance by courts to allow an industry to set its own standards and concluding that even compliance with regulatory standards does not necessarily preclude a finding that blood bank was negligent in failing to take additional precautions); *Vuono v. New York Blood Center, Inc.,* 696 F.Supp. 743, 747 (D.Mass.1988) (conformity with customs and standards of

industry does not establish conclusively the absence of negligence); *Townsend v. Kiracoff,* 545 F.Supp. at 468 (in a medical malpractice action, plaintiff entitled to prove that entire community's custom was negligent); *Nesbitt v. Community Health of South Dade, Inc.,* 467 So.2d 711, 714–15 (Fla.App.1985) (holding that even in malpractice cases customary methods of conduct are merely evidence of standard of care and do not conclusively establish absence of negligence); *Chiero v. Chicago Osteopathic Hosp.,* 74 Ill.App.3d 166, 29 Ill.Dec. 646, 652, 392 N.E.2d 203, 209 (1979) (stating that in a professional medical malpractice case evidence that defendant's conduct conformed with general custom is indicative of due care, but may be overcome by evidence that prevailing custom was itself negligent); *Lundahl v. Rockford Memorial Hosp. Ass'n,* 93 Ill.App.2d 461, 235 N.E.2d 671, 674 (1968) (stating that the usual and customary medical procedure might itself be negligent); *Favalora,* 144 So.2d at 550–51 (holding that conformity with standard of care observed by other medical authorities in the same community is not a defense to malpractice when entire community's custom is negligent); *Vassos v. Roussalis,* 625 P.2d 768, 772 (Wyo.1981) (stating that the skill, diligence, and knowledge required of a professional are not those "customarily" exercised and applied but those that are "reasonably" exercised and applied and that negligence cannot be excused on the grounds that others practiced the same kind of negligence).

### C.

In sanctioning the admissibility of the Quintanas' expert opinion evidence, we, of course, express no opinion on whether the blood banking community's standard of care was in fact unreasonably deficient or whether UBS was negligent in not utilizing a stricter regimen of donor screening and blood testing. We simply hold that the trial court should have permitted the Quintanas to present expert opinion testimony challenging the standard of professional care on which UBS relied in its operations. If the Quintanas had been permitted to present their expert opinion evidence, the jury then would have been required to consider whether the blood banking community's standard of care was indeed adequate and, if so, to resolve whether UBS adhered to that standard in procuring and processing the blood donation later used in treating Mrs. Quintana. If the jury had determined that the national blood banking community's standard was itself unreasonably deficient, it would have been required to resolve the issue of UBS's negligence on the basis of all the evidence bearing on UBS's conduct in procuring and processing the blood donation in question, including the data generated by the Centers for Disease Control, the Food and Drug Administration's recommendations for whole blood centers and source plasma centers, the data and recommendations generated by various groups within the national blood banking community, and the practices employed by particular entities in attempting to minimize the risk of transmitting AIDS through blood and plasma transfusion.

### D.

█ The detrimental effect of the trial court's erroneous evidentiary ruling on the Quintanas' negligence claim was exacerbated by two jury instructions on the standard of care. Instruction No. 20 defined negligence as the failure of UBS to meet the standard of the professional community to which it belonged—whether that community be the whole blood bank community or the source plasma community—as determined by the testimony of experts. This same theme was echoed in Instruction No. 21, which told the jury that UBS, whether considered as a member of the whole blood community or the source plasma community, would not be negligent as long as its procedures were consistent with the standard of care utilized by the community to which it belonged. In addition, Instruction No. 21 told the jury that where different procedures were routinely available to and used by the blood banking community in accordance with the community's standard of care, UBS could choose from among those different procedures as long as it used its best judgment in making that

choice. The cumulative effect of these instructions was to create an irrebuttable presumption that UBS's compliance with the practices and procedures of the blood banking community constituted due care, regardless of whether those practices and procedures were themselves unreasonably deficient in failing to utilize available scientific safeguards designed to minimize the risk of transmitting AIDS through contaminated blood or its components.

We agree with the court of appeals' conclusion, therefore, that the trial court, under the particular circumstances of this case, erred in precluding the Quintanas from offering expert opinion evidence tending to establish the negligently deficient standard of care utilized by the national blood banking community in procuring and processing blood and its components and that the trial court further erred in instructing the jury that UBS's compliance with the blood banking community standard of care established, as a matter of law, due care and the absence of any negligence. We accordingly affirm the judgment of the court of appeals and, for the reasons stated herein, we remand the case to that court with directions to return the case to the district court for a new trial in accordance with the views herein expressed.