## The STATE BOARD OF MEDICAL EXAMINERS, Petitioner,

### v.

### Brian L. McCROSKEY, M.D., Respondent.

### No. 93SC471.

Supreme Court of Colorado, En Banc.

Sept. 12, 1994.

Rehearing Denied Oct. 11, 1994.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Linda L. Siderius, First Asst. Atty. Gen., Robert N. Spencer, Asst. Atty. Gen., Regulatory Law Section, Denver, for petitioner.

Strate and Tondre, P.C., Brice A. Tondre, Wheat Ridge, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

In *Colorado State Board of Medical Examiners v. McCroskey,* No. 92CA1433 (Colo. App. June 17, 1993) (not selected for publication), the court of appeals reversed the final order of the Colorado Board of Medical Examiners (the Board) directing that a letter of admonition be issued to Dr. Brian L. McCroskey for unprofessional conduct. We granted certiorari in order to determine whether the Board was bound by the finding of the administrative law judge (the ALJ) on the existence and nature of a "generally accepted standard of medical practice." We now reverse and remand this case to the court of appeals with directions.

I

McCroskey is a physician licensed to practice medicine in Colorado and thus is subject to the Medical Practice Act, sections 12–36–101 through –137, 5B C.R.S. (1991 & 1993 Supp.). In 1990, an inquiry panel of the Board [1] issued a letter of admonition to McCroskey based upon a series of well-publicized incidents arising from the care of a stab-wound victim at Denver General Hospital (DGH) in 1988. Although the patient's initial condition was thought to be stable, he bled to death several hours after his admission. As the attending surgeon on the date of the events in question, McCroskey had the final word on the patient's treatment and was responsible for the accurate completion of the patient's medical record. McCroskey declined to accept the letter of admonition and,

---

1. The Board is divided into two panels for disciplinary proceedings: an inquiry panel and a hearings panel. The inquiry panel is responsible for investigating complaints to determine whether formal charges are warranted. The hearings panel conducts the formal hearing and determines the discipline to be imposed. In lieu of the hearings panel, the case can be referred to an ALJ for an initial decision which is then reviewed by the Board. § 12–36–118(1), 5B C.R.S. (1991); *Norton v. Colorado State Bd. of Medical Examiners,* 821 P.2d 897, 903 (Colo.App.1991); *Horwitz v. Colorado State Bd. of Medical Examiners,* 716 P.2d 131, 133 (Colo.App.1985), *appeal dismissed, cert. denied,* 479 U.S. 803, 107 S.Ct. 44, 93 L.Ed.2d 7 (1986).

pursuant to section 12–36–118(4)(c)(III),[2] a formal disciplinary hearing was held.

Initially, the inquiry panel charged McCroskey with four counts of unprofessional conduct under section 12–36–117(1)(p), alleging that McCroskey committed two or more acts which failed to meet generally accepted standards of medical practice.[3] One count was dismissed either prior to or at the hearing before the ALJ and alleged that McCroskey requested that a pathologist alter the patient's official autopsy report. A second count, which the ALJ found was not supported sufficiently by the evidence, charged that McCroskey unreasonably delayed getting to the hospital after being called by the chief resident.

The remaining two counts involved alterations or additions to the patient's medical record. First, the ALJ found that medical record-keeping is part of "medical practice," and thus falls within the scope of section 12–36–117(1)(p). The ALJ further found that McCroskey committed an act which failed to meet generally accepted standards of medical practice when he erased and wrote over a pre-operative note made by another physician concerning the patient's estimated blood loss.[4]

After listening to conflicting expert testimony, the ALJ concluded that McCroskey did not violate generally accepted standards of medical practice by adding a "staff note"

to the patient's medical record days or weeks after the patient's death and backdating the note to the date of death.[5] "While the better practice is to date such an entry as of the date it is made, in practice many physicians date their entries as of the date of the occurrence." According to the ALJ, this fact brought McCroskey's conduct within the standard of care under the "respectable minority" rule articulated in *Hamilton v. Hardy*, 37 Colo.App. 375, 379–80, 549 P.2d 1099, 1104 (1976) (only when it is shown that a respectable minority of physicians approved of a course of action should a medical malpractice case be taken from the jury). Since section 12–36–117(1)(p) requires proof of two or more acts of substandard care to support disciplinary action, the ALJ concluded that McCroskey was not subject to discipline.

On review of the ALJ's decision, the Board accepted the ALJ's evidentiary finding that many physicians date a medical record entry to reflect the date of the medical event, rather than the date on which the entry was made. The Board disagreed, however, with the ALJ's conclusion that this fact brought McCroskey's conduct within generally accepted standards of medical practice. Instead, the Board determined that "the weight of the evidence supports the conclusion that backdating a medical record entry falls below generally accepted standards of practice."[6]

2. This section provides:

(c) On completion of an investigation, the inquiry panel shall make a finding that:

. . . .

(III) The investigation discloses an instance of unprofessional conduct which, in the opinion of the inquiry panel, does not warrant formal action by the board but which should not be dismissed as being without merit; in such case, a certified letter . . . of admonition shall be sent to the physician against whom a complaint was made . . . but . . . such physician shall be advised that he has the right to request in writing . . . that formal disciplinary proceedings be initiated against him to adjudicate the propriety of the conduct upon which the letter of admonition is based. . . .

§ 12–36–118(4)(c)(III), 5B C.R.S. (1991).

3. Section 12–36–117(1)(p) defines "unprofessional conduct" as follows:

(p) An act or omission constituting grossly negligent medical practice or two or more acts or omissions which fail to meet generally ac-

cepted standards of medical practice, whether the two or more acts or omissions occur during a single treatment of one patient, during the course of treatment of one patient, or during the treatment of more than one patient;

§ 12–36–117(1)(p), 5B C.R.S. (1991).

4. Specifically, the original record entry was completed by a surgical resident on the date of the patient's death and stated that the patient's blood loss just prior to surgery was "now greater than 3000 ccs." Sometime after the autopsy, McCroskey changed the record to read that the patient's blood loss was "now greater than 2000 ccs."

5. This note purported to explain the course of the patient's care and the cause of his death.

6. According to the Board, medical record integrity was especially important in this case since the patient died under circumstances raising questions about the quality of care rendered by hospital staff. The cause of the patient's death, whether due solely to the stab wound or contrib-

Having thus found two acts which fell below generally accepted standards of medical practice, the Board concluded that McCroskey committed unprofessional conduct under section 12–36–117(1)(p), and issued a letter of admonition.

On appeal, the court of appeals concluded that the Board erroneously rejected the ALJ's finding that McCroskey's backdating of the staff note did not violate generally accepted standards of medical practice. *McCroskey,* slip op. at 4. Specifically, the court of appeals held that "[t]he existence of a 'generally accepted' standard of care and its nature is an evidentiary, not an ultimate, fact that must be supported by substantial evidence." *Id.* Since the ALJ's determination of the standard of practice was not contrary to the weight of the evidence, the court concluded that the Board was bound by this finding under section 24–4–105(15)(b), 10A C.R.S. (1988), of the State Administrative Procedure Act. *Id.* at 5. Consequently, the court reversed the Board's order and directed the Board to withdraw its letter of admonition and to delete any reference to the letter in McCroskey's files.

## II

■ As a state agency with statewide territorial jurisdiction, the Board's actions are governed by the State Administrative Procedure Act, sections 24–4–101 to –108, 10A C.R.S. (1988 & 1993 Supp.). Section 24–4–105(15)(b) of the Act sets forth the appropriate scope of review to be employed by the Board when reviewing an ALJ's decision:

> (b) The findings of evidentiary fact, as distinguished from ultimate conclusions of fact, made by the administrative law judge or the hearing officer shall not be set aside by the agency on review of the initial decision unless such findings of evidentiary fact are contrary to the weight of the evidence.

§ 24–4–105(15)(b), 10A C.R.S. (1988).

■ As this section makes clear, the Board's ability to review and to set aside an ALJ's finding turns on whether the finding is one of "evidentiary" or "ultimate" fact. A finding of evidentiary fact cannot be set aside by the Board on review of an ALJ's decision unless the finding is contrary to the weight of the evidence in the record. § 24–4–105(15)(b); *Colorado State Bd. of Nursing v. Lang,* 842 P.2d 1383, 1387 (Colo.App.1992). On the other hand, the Board can substitute its judgment for that of the ALJ with respect to an ultimate conclusion of fact, *Ricci v. Davis,* 627 P.2d 1111, 1120 n. 7 (Colo.1981); *Davis v. State Bd. of Psychologist Examiners,* 791 P.2d 1198, 1202 (Colo.App.1989), so long as the Board's finding has a reasonable basis in law and is supported by substantial evidence in the record. *Lee v. State Bd. of Dental Examiners,* 654 P.2d 839, 844 (Colo. 1982); *People ex rel. Woodard v. Brown,* 770 P.2d 1373, 1379 (Colo.App.1989).

■ The distinction between evidentiary facts and ultimate conclusions of fact is not always clear. *Federico v. Brannan Sand & Gravel Co.,* 788 P.2d 1268, 1272 (Colo.1990). In general, however, evidentiary facts are the detailed factual or historical findings upon which a legal determination rests. *Lee,* 654 P.2d at 843; *Lang,* 842 P.2d at 1387. For example, in this case, the evidentiary facts would include a determination of whether and when McCroskey made the written entries in question.

■ In contrast, findings of ultimate fact involve a conclusion of law, or at least a mixed question of law and fact, and settle the rights and liabilities of the parties. *Blaine v. Moffat County Sch. Dist.,* 748 P.2d 1280, 1287 (Colo.1988); *Lee,* 654 P.2d at 844; *Puls v. People ex rel. Woodard,* 722 P.2d 424, 426 (Colo.App.1986). Unlike evidentiary facts, ultimate conclusions of fact usually are phrased in the language of the controlling statute or legal standard. *Federico,* 788 P.2d at 1272; *Blaine,* 748 P.2d at 1287; *Ricci,* 627 P.2d at 1118; *see also Lee,* 654 P.2d at 844 (board's determinations were findings of ulti-

---

uted to by neglect of the hospital staff, figured significantly in DGH's peer review and in subsequent criminal and civil proceedings. By making the medical record entries in the fashion

which he did, the Board maintains that McCroskey "unnecessarily clouded the integrity of the record and confused an accurate determination of the cause of the patient's death."

mate fact because they were stated in terms of the controlling legal standards).

In its final order, the Board treated the ALJ's findings concerning whether physicians backdate medical records as a finding of evidentiary fact. However, the Board regarded the ALJ's conclusion concerning whether such conduct amounted to substandard care as an ultimate fact, not binding on the Board:

> The Board does not dispute the ALJ's finding of evidentiary fact that many physicians may date a medical record entry to reflect the date of the medical event in question, rather than the date upon which the entry in the record was made. However, as noted above, the Board disagrees with the ALJ's conclusion that backdating a medical record entry does not fall below generally accepted standards. Rather, the weight of the evidence clearly supports the conclusion of law that backdating a medical record fails to meet generally accepted standards of practice.

Several reasons cause us to agree with the Board and to hold that the ALJ's finding on the nature and existence of the "generally accepted standards of medical practice" is a finding of ultimate fact.

 First, a determination of the nature and existence of the "generally accepted standards of medical practice" is best viewed as a mixed question of law and fact; it is not simply a factual finding of raw historical data. It is a question of fact to the extent that the applicable standard usually must be established by expert testimony,[7] *United Blood Services, a Div. of Blood Systems, Inc. v. Quintana,* 827 P.2d 509, 520 (Colo.1992); *Melville v. Southward,* 791 P.2d 383, 387 (Colo.1990), and will vary depending upon the circumstances of the case. However, the phrase "generally accepted standards" primarily is a *"legal* concept that refers to norms of conduct applicable to similar persons in like circumstances." *Davis,* 791 P.2d at 1203 (emphasis added); *see also Quintana,* 827 P.2d at 519 (standard of care is a question of law). Thus, here, McCroskey's compliance with "generally accepted standards of medical practice" required him to exercise the same degree of knowledge, skill, and care as exercised by other physicians in the same field of medicine during the time period in question.[8] *Melville,* 791 P.2d at 387.

 Furthermore, determining the standard of care often entails applying legal principles to the evidentiary facts, as the case now before us demonstrates. Here, the ALJ reached his conclusion that McCroskey did not violate the standard of care by applying the "respectable minority" test found in *Hamilton v. Hardy,* 37 Colo.App. 375, 549 P.2d 1099 (Colo.1976). According to this test, a deviation from a higher standard of care practiced by the majority is excusable when it is shown that a respectable minority of physicians approved of the course of action selected. *Id.* at 379–80, 549 P.2d at 1104. However, after our decision in *Quintana,* 827 P.2d 509, *Hamilton* no longer reflects the law governing the standard of care, and we now expressly overrule that case. By following *Hamilton,* therefore, the ALJ applied an improper legal standard to the evidentiary facts which he had found.

 In *Quintana,* this court made it clear that the standards of medical practice cannot be determined simply by counting how many physicians follow a particular practice. "[N]egligence cannot be excused on the grounds that others practiced the same kind of negligence." *Quintana,* 827 P.2d at 526. In other words, ascertaining

---

7. Thus, there is no merit to McCroskey's argument that due process prohibits the Board from substituting its own judgment on the standard of care. The Board may draw a different conclusion from the evidence presented to the ALJ. *Colorado State Bd. of Medical Examiners v. Hoffner,* 832 P.2d 1062, 1067 (Colo.App.1992); *Puls,* 722 P.2d at 426. However, this conclusion must be based on the expert testimony contained in the record. The Board does not have the authority to set the standard of care from its own

knowledge when that standard has not been presented and tested in the hearing process. *McKay v. State Bd. of Medical Examiners,* 103 Colo. 305, 312–13, 86 P.2d 232, 236 (1938).

8. However, evidence of a physician's compliance with the community standard is not conclusive proof of due care. Expert opinion testimony may show that the entire community standard is deficient. *Quintana,* 827 P.2d at 521.

the objectively reasonable standard of care is more than just a factual finding of what all, most, or even a "respectable minority" of physicians do, although the actual practice in a community is certainly the starting point in any analysis. The customary or prevailing practice may not be adequate or objectively reasonable in light of all the facts and circumstances. In *Quintana,* for example, none of the members of the blood banking community used the testing and screening procedures advocated by the plaintiff. In such cases, health care professionals may be held to an objective standard of reasonable care which differs from the community standard. *See id.* at 525–26 and cases cited therein.

■ This is not to say that the existence and nature of a generally accepted standard of care is always a matter of ultimate fact. As we have previously recognized, a particular fact may be an evidentiary fact in certain circumstances, and an ultimate conclusion of fact in others. *Baca v. Helm,* 682 P.2d 474, 477 (Colo.1984). In this case, however, the generally accepted standard of medical practice can be determined only by evaluation of the expert testimony in light of the controlling legal principles. Additionally, section 12–36–117(1)(p) expressly defines "unprofessional conduct" as two instances which fail to meet "generally accepted standards of medical practice." And, when the phrase "generally accepted standards" appears in the relevant disciplinary statute, courts treat the ALJ's conclusions concerning the standard of care as a finding of ultimate fact. *See Hall v. Colorado State Bd. of Medical Examiners,* 876 P.2d 77, 81 (Colo. App.1994) ("[t]he conclusion that the applicant's conduct constituted two or more acts of substandard medical care [under section 12–36–117(1)(p) ] was an ultimate finding of fact...."); *Davis,* 791 P.2d at 1202 (whether psychologist's conduct violated "generally accepted standards of psychological practice" under section 12–43–111(1)(h) was an ultimate fact). This is so because resolution of the question of the standard of care "settle[s] the rights and liabilities of the parties." *Lee,* 654 P.2d at 844. It is dispositive of a physician's liability for discipline under section 12–36–117(1)(p).

■ Treating the generally accepted standard of medical practice as an ultimate fact is also consistent with the disciplinary scheme established by the Medical Practice Act. The importance of the distinction between ultimate and evidentiary facts is that it determines whether it is the ALJ or the agency which has discretion over the matter to be determined. *Federico,* 788 P.2d at 1273–74 (Mullarkey, J., concurring in part and dissenting in part). We believe that there are compelling policy reasons for recognizing the Board's discretion to determine the standard of care. First, the Board has the advantage of technical and administrative expertise to decide issues involving the standard of medical practice. Section 12–36–103(2), 5B C.R.S. (1991), provides that:

> (2) The board shall be comprised at all times of seven members having the degree of doctor of medicine, and two members having the degree of doctor of osteopathy, all of whom shall have been licensed and actively engaged in the practice of their professions in this state for at least three years next preceding their appointments....

In contrast, an ALJ is not required to have any medical training or knowledge. *See* § 24–30–1003(2), 10A C.R.S. (1993 Supp.) (ALJs need only be attorneys in good standing, with five years' experience practicing law). It would be pointless for the General Assembly to create a group of such experienced physicians, only to bind the Board's discretion by the ALJ's interpretation of the standard of medical practice.

■ Moreover, the Board must have discretion to determine the generally accepted standard of medical practice in order to properly enforce the Medical Practice Act. The legislative declaration creating the Board states that the purpose of the Act is to protect the public "against unauthorized, unqualified, and improper practice of the healing arts in this state." § 12–36–102, 5B C.R.S. (1991); *Hoffner,* 832 P.2d at 1068. In order to accomplish this purpose, the Board must be accorded the authority to define the grounds for medical discipline on a case-by-case basis. *See Ricci,* 627 P.2d at 1118 (finding ultimate facts is exclusive prerogative of

school board because board must have case-by-case authority to define grounds for dismissal). Backdating a minor or trivial item may not warrant discipline, whereas backdating another entry on a patient's chart may be a very serious matter. Due to its expertise, the Board appropriately is charged with evaluating the magnitude of a physician's conduct by placing the events in their proper factual context. *See Coe v. United States Dist. Court*, 676 F.2d 411, 414 (10th Cir.1982) (Board is presumed to know better than laymen the ethics of their profession and that which renders one unfit to engage or continue in the practice of medicine).

Finally, if the discretion to determine the generally accepted standard of medical practice is removed from the Board, physicians will be subject to varying interpretations of the standard by different ALJs. This will result in decisions which are not uniform, even though the facts may be similar. The importance of uniformity was voiced by the concurring justices in *Baca* in the context of disability benefits:

> [T]he legislature granted the commission the power to make independent ultimate conclusions of fact. Thus, there will be uniform decisions made by the commission concerning issues of causation which arise under similar fact patterns. This legislative purpose is particularly important in claims involving occupational diseases. If causation is limited to the status of an evidentiary fact in any case, then whether similarly situated claimants recover benefits under the Act is wholly dependent upon the referee to whom the case is assigned.

*Baca*, 682 P.2d at 479–80 (Neighbors and Rovira, JJ., specially concurring). Similarly, if the generally accepted standard of medical practice is merely an evidentiary fact, a physician's liability for discipline may be "wholly dependent" upon the ALJ to whom the case is assigned.

■■■ Having concluded that the existence and nature of a "generally accepted standard of practice" is a question of ultimate fact, we must next consider whether the Board's findings were supported by substantial evidence in the record. If they were, then the Board's decision must be upheld. *See Lee*, 654 P.2d at 844; *Brown*, 770 P.2d at 1379.

■■■ In our view, there is ample evidence in the record to support the Board's conclusion that McCroskey violated generally accepted standards of medical practice by backdating an entry in the patient's medical record. All three of the inquiry panel's expert witnesses testified that the generally accepted standard of practice requires that a medical record entry be dated with the date it is made. Even one of McCroskey's expert witnesses acknowledged that misdating the record entry was "certainly something [McCroskey] shouldn't have done." McCroskey did not simply backdate a trivial note in a patient's medical record. Instead, McCroskey's actions took place in the context of a patient's death which resulted in a coroner's autopsy, peer review activities, publicity, and several legal actions. McCroskey was the attending physician responsible for the accuracy of the patient's medical record, and yet he engaged in conduct which cast doubt upon the medical record's integrity. Under these circumstances, the Board was justified in considering McCroskey's conduct to violate the standard of care.

■■■ The ALJ relied heavily on the fact that many physicians in practice date their entries as of the date of the medical occurrence, even though "the better practice is to date such an entry as of the date it is made." However, the fact that "many" physicians may backdate their entries does not, in itself, bring the practice within the appropriate standard of care. *See Quintana*, 827 P.2d at 520 (standard adopted by a practicing profession is not conclusive proof of due care).

Since the Board's decision was supported by substantial evidence, we hold that the court of appeals erred in reversing the Board's order. Accordingly, we reverse the

court of appeals and remand the case for further proceedings consistent with this opinion.[9]

9. On appeal, McCroskey also argued that the Medical Practice Act did not purport to regulate the manner of record-keeping until the adoption of § 12–36–117(1)(cc), 5B C.R.S. (1991), in 1989. *McCroskey,* slip op. at 2. The court of appeals did not reach this issue, however, because it held that the Board was bound by the ALJ's finding of the standard of care. Since we reverse the court of appeals and hold that the standard of care is an ultimate fact, it will be necessary for the court of appeals to address McCroskey's argument on remand.